Filed 6/17/15  P. v. Hernandez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B256234 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA128347) |
| v. | |
| ANTONIO HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Judge.  Affirmed in part and reversed in part.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie C. Brenan, Supervising Deputy Attorney General, and Brendan Sullivan, Deputy Attorney General, for Plaintiff and Respondent.

_____

A detective urged the defendant to explain the motivation for a shooting, telling the defendant several times that probation was better than serving up to 20 years in state prison, expressly stating on multiple occasions that the case was going away, indicating there would be no prosecution because the victim was not cooperative and did not care, and that the detective might simply write up his report and not even submit it to the district attorney. We conclude that, under the totality of the circumstances, the defendant's tape recorded confession was motivated by these express and implied promises of leniency and therefore involuntary. We further conclude admission of the involuntary confession was not harmless beyond a reasonable doubt, and reverse the three counts related to the confession.

Defendant and appellant Antonio Hernandez was convicted by the jury of the following offenses: count 1 – willful, deliberate, premeditated attempted murder, in violation of Penal Code sections 664 and 187[1]; count 2 – assault with a firearm, in violation of section 245, subdivision (a)(2); and counts 3 and 4 – possession of a loaded and unregistered firearm, in violation of section 25850, subdivision (a). The jury found true various firearm use allegations in counts 1 and 2.[2] The trial court sentenced defendant in count 1 to life in prison, enhanced by 20 years for use of a firearm within the meaning of section 12022.53, subdivision (b). Sentence in count 2 was imposed and stayed pursuant to section 654. One year concurrent terms were imposed in counts 3 and 4.

Defendant raises three issues in his timely appeal from the judgment. First, he argues he did not knowingly, voluntarily, and intelligently waive his right to remain silent prior to questioning. Second, he contends his confession was involuntary under the Fifth

[1] All statutory references are to the Penal Code, unless otherwise indicated.

[2] The jury found not true allegations that the shooting was motivated by race, that the offenses were for the benefit of a criminal street gang, and that the victim suffered great bodily injury.

2

Amendment because it was induced by promises of leniency. Third, defendant argues the sentence in count 3 for carrying a loaded and unregistered firearm should have been stayed under section 654, because the conviction arose out of the same course of conduct as the attempted murder in count 1. We agree with the contention that defendant's confession was involuntary, and reverse the convictions in counts 1, 2 and 4.[3] The conviction in count 3 is unaffected by the involuntary confession and affirmed. Because substantial evidence of guilt exists independent of the involuntary confession, we remand the cause to the trial court for further proceedings on counts 1, 2 and 4.

# FACTS[4]

### Prosecution Evidence

#### The Shooting of Dejuan Becker

Dejuan Becker was shot after leaving his house in the area of Belhaven and 113th Street on April 17, 2012.[5] Before the shooting he heard someone inside a green or black car say, "Fuck blacks."[6] He saw two young Hispanic males, one with long hair, inside the car, but Becker was not sure if the driver or passenger was shooting. He saw the passenger with guns but cannot say if the driver had a gun and never saw the driver

---

[3] Because we reverse the convictions in count 1, we need not address defendant's contention that the sentence in count 3 should be stayed under section 654.

[4] The factual summary omits the testimony relating to the gang, hate crime, and great bodily injury allegations, all of which were found not true by the jury.

[5] All dates are in 2012, unless otherwise stated.

[6] The first time Becker mentioned hearing someone yell, "Fuck blacks," was at the preliminary hearing, 10 months after the shooting.

holding a gun.  He thinks over ten shots were fired.  One of the shots struck and shattered Becker's right elbow, resulting in him spending four or five days in the hospital.

Shortly after the shooting Officer Andrew Chambers saw the injured Becker sitting on a porch at Belhaven and 113th Street.  Becker said he saw two Hispanic males in a green Camaro.  Becker told Officer Chambers that he was riding his bicycle when the driver, who had long hair, fired about seven shots.

Becker was interviewed in the hospital by Detective Freddy Lilomaiava on April 19.  Becker, who has a history of criminal convictions and spent time in state prison, testified that he is an associate of the Belhaven Bounty Hunter Bloods gang, although other compelling evidence, such as Becker's gang tattoos, demonstrated that he is an active member of the gang.  Becker's trial testimony that he had no idea who shot him was impeached with Detective Lilomaiava's testimony that Becker told him he was shot by the driver of the green Camaro.  The driver was a young Hispanic male with long hair. Detective Lilomaiava also impeached Becker's testimony denying that he told the detective that he had seen the shooter before and that the shooter was the little brother of "T," someone he used to smoke with and who was killed at a party three years earlier. Becker told Detective Lilomaiava he could identify the shooter.

*Defendant's Arrest for Possession of a Firearm and the Reinterview of Becker*

Officer Jonathan Vander Lee arrested defendant on September 16.  Defendant was in possession of a loaded and unregistered .45 caliber handgun.  A cell phone recovered from defendant contained a text message stating,  "Hey have you used da [*sic*] .380 to see if it jambs and how much for the .45?"  Defendant consented to a search of his residence, which lead to the seizure of a loaded .357 Smith and Wesson chrome revolver, marijuana and associated paraphernalia.

Becker was in custody on a parole violation on September 17, the day after defendant was arrested for possession of the firearms.   Detective Lilomaiava showed him a six pack of photographs, one of which was of defendant.  Becker laughed after looking

4

in the direction of defendant's photograph, stating that he did not want to be labeled a snitch while in custody and he needed to talk to his mother before deciding whether he will talk to Detective Lilomaiava. Becker was shown a still photo captured from surveillance video from the day of the shooting, depicting a green Camaro, which Becker identified as the exact car used in the shooting. Becker denied telling the prosecutor and Detective Lilomaiava that the driver shot at him, but was impeached with his prior statement to the contrary. Becker did not recognize a photograph of Heriberto Genis, a member of the Mid City Stoners, a rival gang to the Bloods, but he had heard of him and had been arrested for Genis's murder but not charged.

Genis was murdered near defendant's home on December 21 by members of the Bloods.

*Initial Interview of Defendant Regarding his Arrest for Firearm Possession*

Detective Lilomaiava conducted an in-custody interview of defendant on September 17. The initial portions of the interview were tape recorded. Detective Lilomaiava explained that he was handling defendant's arrest for possession of a firearm, he was going to put the case together to present to the district attorney,[7] and that he did not have much information other than what was in the report he had read. Detective Lilomaiava told defendant that he tries to talk to the person arrested so he can present the whole story, because presenting both sides of the case can help determine at an early stage whether probation is granted or a time-served disposition is reached. According to the detective, often people who have been arrested previously do not want to talk, but sometimes they do and admit their mistake, and the district attorney decides to "just [] leave it as is."

---

[7] The detective at first stated he would present the case to defense counsel and the court, but then corrected himself by stating he would go to the prosecutor.

Detective Lilomaiava advised defendant of his constitutional rights as defined in *Miranda.*[8]  Defendant said he understood each of the rights and proceeded to answer the detective's questions.  Defendant said he knew why he had been arrested.  Detective Lilomaiava noted that defendant and defendant's father had been cooperative regarding a search of defendant's room, where marijuana and a gun were found.  Defendant admitted the gun found in the search was his and that he had it for about a year.  Defendant also admitted he was in possession of a gun when arrested.  Detective Lilomaiava said "there's been a lot of shit going on in that little area," and defendant said that one of his friends had been killed by the Blacks.  Defendant said he had obtained the gun within the last few months for protection.

Detective Lilomaiava said he also wanted to talk to defendant about the murder of defendant's friend.   The detective told defendant he knew defendant's brother was killed at a party when defendant was younger.  Detective Lilomaiava asked if defendant wanted to write a statement about what happened when defendant was arrested  or if he wanted the detective to write a brief statement.  Defendant asked the detective to write a brief statement.

*Initial Questioning Regarding the Shooting of Becker*

When Detective Lilomaiava finished his questioning about defendant's September 16 arrest, he told defendant that he had been working on a case involving an April shooting in the area where defendant lived.  Before questioning defendant about that shooting, Detective Lilomaiava again read defendant his *Miranda* rights, which defendant stated he understood.

Detective Lilomaiava said he had information that defendant might have been involved in the April shooting.  He said he understood that Black guys were shooting at Hispanics and then it goes back and forth.  He told defendant that a Black male was shot

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6

while walking after "you guys drove up on him." Detective Lilomaiava said the victim survived and identified defendant as the shooter.[9] Defendant was shown a screen capture from a surveillance video, which showed defendant driving a green Camaro five minutes before the shooting. Detective Lilomaiava stated he knew he had the right person. Detective Lilomaiava said that before he presents that case to the district attorney he wants to talk to defendant to see what defendant has to say.

Defendant said he did not remember the shooting incident with the Black male. Detective Lilomaiava said he wanted to put this case together and present it to the district attorney, which is why he asked defendant about the guns. Defendant was told to keep in mind he had been identified by a couple of people.[10]

Detective Lilomaiava said defendant did not have much of a record and he is trying to put "this thing" together and present it to the district attorney. If defendant wants to talk about the shooting the detective would write it up and send it through and see what they say. Detective Lilomaiava explained that is hard with people having identified defendant as the shooter and "there's the difference between being on probation . . . and being 15, 20 years in jail, in prison. And I don't want you to be sitting in prison, uh, 5, 10 years from now and figure out, say hey you know what? Maybe I should've said something to the, uh, to the detective when he was talking to me that day." Detective Lilomaiava said a lot of people sit there and figure that out too late, "and I don't want that to happen to you, man. You're pretty young, man. And you don't have a whole lot, uh, in your rap sheet."

---

[9] Becker, the shooting victim, never made an identification of defendant.

[10] Detective Lilomaiava testified that no other person identified defendant as the shooter.

Detective Lilomaiava said the firearms were being tested and "the [DNA] evidence and all that shit's coming."[11] He is trying to put all these things together before any of the added on stuff "that will come bite you in the ass. [¶] You know what I mean?" After recounting the situation, Detective Lilomaiava reminded defendant it took him four or five months to put the shooting case together. He wanted to talk to defendant to see what he says and ask "why this shit happened?"

Defendant replied that it was for protection. Detective Lilomaiava asked defendant why he thinks the detective knew about defendant's brother being killed. The person defendant shot was a friend of defendant's brother and knew defendant. Defendant denied owning or driving a Camaro, stating that he only drives his father's trucks.

Detective Lilomaiava repeated that there is a difference between probation and going to prison for a long time. Defendant said he understood. Detective Lilomaiava did not know the motive for the shooting, but maybe something happened before, such as one of defendant's friends being shot. Defendant said he did not recall that incident. Detective Lilomaiava said someone was shot in front of defendant's house, but defendant denied knowledge of that happening.

Detective Lilomaiava asked what defendant's parents would think if they found out about the shooting. Defendant said they would cry. Detective Lilomaiava again said there is a difference between probation and defendant getting 15 to 20 years for this shooting. Defendant asked what the detective meant by probation. Detective Lilomaiava said he did not make that decision, but often when cases are presented the police speak to the district attorney and they make the decision. He said there is always a motive and asked "why you carried a gun. [¶] To protect yourself, right?" Defendant agreed.

---

[11] Because of the different caliber of the weapons seized from defendant and those fired at the shooting of Becker, the seized weapons were not fired at Becker. No DNA evidence was presented at trial.

Detective Lilomaiava said he would say defendant had this gun and was honest about it, because he had the gun to protect himself after his friend just got killed a few weeks before. The detective would say there were lots of shootings between Hispanics and Blacks, not all of which were even gang related, and that is why defendant had a gun. Detective Lilomaiava said he is talking about the shooting because it gives him an idea of what he needs to sell to the district attorney's office. The detective wanted to talk about the shooting, "Just like I'm going to sell this to them." At this point, defendant asked Detective Lilomaiava to turn off the tape recorder.

*The Unrecorded Portion of the Interview*

Because defendant asked that the recording stop, Detective Lilomaiava took the recorder out of the room, but left it running. The tape ran for 12 minutes until the recording picks up with the final segment of the interview. Detective Lilomaiava testified that in the unrecorded portion of the interview, defendant said he and his friends were hanging out in the front yard of his house smoking marijuana on the morning of April 17. A group of Black males from the Belhaven Bloods gang approached and asked defendant's group where they were from, referring to gang affiliation. A fight ensued, ending with the Black males beating defendant and his friends and stealing marijuana and money.

That afternoon defendant was driving in the green Camaro within a block of his house, looking for the Black males. Defendant was with a passenger, who he refused to identify. Defendant saw a Black male riding a bicycle on 113th Street. Defendant pulled out a gun and shot twice.

At this point in the interview, a worker at the police station brought the tape recorder back into the interview room. Detective Lilomaiava left the recorder running for the balance of the conversation.

*Defendant's Recorded Confession*

9

Detective Lilomaiava began the second tape recorded portion of the interview by saying that he is trying to figure out what happened and "basically try to make it go away," which is why the detective needed defendant's help. Detective Lilomaiava said, "I can make it go away with you talking to me and telling me what happened. [¶] You know what I mean?" Defendant said he did not want "that coming back to me" and asked if he could "have that in writing." Detective Lilomaiava assured defendant it would be in a report, but defendant said he wanted to see paperwork stating "that thing won't come back." Detective Lilomaiava said he would record it and write a report, but defendant said he "got screwed already, man." After a few additional comments, Detective Lilomaiava stated, "Listen, I, I got to go. I have to be somewhere. All I'm trying to do is trying to figure this thing out and make it, I can make it go away but . . . ." Defendant asked "but this thing is going to go away, right?" Detective Lilomaiava answered, "Yeah."

Defendant clarified that he was talking about the April shooting and not the September arrest for possession of the handgun. Detective Lilomaiava said they had to separate what they were talking about. Defendant said he wanted to separate the two incidents, and Detective Lilomaiava said they were talking about "what happened that day." Detective Lilomaiava said defendant had to worry about the firearms possession case, not the shooting case.

Detective Lilomaiava asked if there was something that led up to the shooting. Defendant replied it had to do with gangs and random people in them. Defendant repeated that he was just smoking marijuana that morning with a couple of friends, and the Black guys socked him and his brother and took his marijuana.

Detective Lilomaiava said he understood the principal of disrespect because he deals mostly with gangs. Defendant again refused to say who was with him in the car at the time of the shooting. He said the shooting victim was not part of the group in the earlier attack. Defendant hesitated to say exactly what happened, except that one thing led to another. Detective Lilomaiava said he would not write that down, and "the dude is

10

not even going to, doesn't even want to do anything with it." According to Detective Lilomaiava, the only reason he was talking with defendant was his desire "to clear my case." Defendant said he did not want to get charged for that case, but Detective Lilomaiava said "that's the case you have to worry about." Detective Lilomaiava said it would "bite you in the ass if you don't talk to me. [¶] But that's the one that I'm trying to help you out with."

Detective Lilomaiava said, "This one, I can honestly tell you that you [*sic*] talking . . . probably go away." Defendant asked if it is up to the district attorney. Detective Lilomaiava said, "It might not even go to the DA. [¶] I might have to just write out a report and file it away." When defendant asked if he could have Detective Lilomaiava's word on that, he said it's on the recording. Defendant replied, "you guys are freaking tricky."

Detective Lilomaiava assured defendant "you don't have to worry about this case, is [*sic*] that the case right there you have to worry about." Referring to the shooting of Becker, defendant asked, "But that's a bigger case, isn't it?" Detective Lilomaiava replied, "Bigger case but sometimes bigger case ain't going anywhere. And that's why I, I told you just better off you saying something." Defendant asked, "That's, this is going away, right?" Detective Lilomaiava answered, "Yeah."

Defendant asked what Detective Lilomaiava would like him to speak about. Detective Lilomaiava said he wanted to know why the shooting happened. Defendant explained that the Blacks were always trying to mess with them so he bought a gun for protection. Defendant got "punked" every day and his house was shot up numerous times. He thinks he shot twice at the guy, he did not know if he was hit, and then he went home.

Detective Lilomaiava said twice more that this is the case defendant had to worry about. He would talk to the district attorney about this case. Defendant objected that Detective Lilomaiava told him he did not have to worry about the shooting case. Detective Lilomaiava said there is "more chance of this case not even going anywhere" and being dropped. Defendant said he did not want to be charged with the shooting case.

11

Detective Lilomaiava said that based on what he knows the case is "not going to go anywhere." Detective Lilomaiava said the only reason he was talking to defendant about it was so that "he can know what happened." He just did not want to be "surprised that fucked up guy he lied to me." He would write it up and have his boss review it. Defendant said, "All right but . . . going to go away, right?" Detective Lilomaiava said he would talk to his boss and "this is probably not going to go anywhere." Detective Lilomaiava said the shooting victim "doesn't give a shit about what happened" and "he . . . doesn't want anything to do with it. [¶] So, you actually lucked out." Detective Lilomaiava reassured defendant "this probably not going to go anywhere."

Defendant continued to express his concern about the shooting case, stating that "I just don't want this coming back to me, man." Detective Lilomaiava said he did not have to worry about the shooting case, implying that the firearms case was defendant's problem. Detective Lilomaiava told defendant to worry about his other case, not the shooting. He suggested that defendant discuss with his attorney how to work out "some freaking probation or some shit." When defendant asked if he could come back with his attorney to write down what had been discussed, Detective Lilomaiava replied "like I said, I wouldn't have to worry about this case. I worry about the one you have in your pocket." The discussion then turned to defendant being released on bail. Detective Lilomaiava again assured defendant, "I wouldn't worry about this case." Defendant asked if he had the detective's word, and Detective Lilomaiava replied, "Yeah."

***Defense Evidence***

Valentin Hernandez, defendant's older brother, did not believe defendant was a gang member. Valentin believed Genis was a member of Mid City Stoners. A brother of defendant and Valentin was shot and killed at a party in 2009.

Defendant testified that he was walking on April 10, when he was approached by several Black males in a car. One of the occupants got out of the car and asked defendant where he was from. Defendant did not recognize the men, but they claimed to be from

12

the Bounty Hunter Bloods and wore red, the gang's color. Defendant said, "I don't bang." One of the men removed marijuana and money from defendant's pockets. Defendant did not resist because he believed the man was armed.

Defendant was afraid because the Bloods were driving around the area, so he called Genis to come pick him up. Genis was being driven by Christian Portillo at the time, so the two of them went to defendant's location. After defendant was in the car, Portillo drove off, but a Black male pulled out a gun and opened fire on the car. Defendant ducked after hearing gunshots. Portillo drove until he found a safe place to stop. He reported the incident to the police a few hours later but did not mention that defendant or Genis had been in the car at the time of the shooting.

Defendant was driving with Genis as a passenger on April 17. He was unaware Genis possessed a gun. Genis directed defendant to turn onto 113th Street, where defendant saw Becker walking with a bicycle. Genis told defendant to slow down. Defendant then saw Genis with a gun in each hand, pointed toward Becker. Genis fired both guns and screamed, "Fuck Bloods." Defendant had no idea Genis was going to shoot. Defendant drove away quickly.

Defendant did not tell anyone about the shooting. He knew Genis was a gang member and did not want to snitch on him. Defendant bought another gun, the .45 caliber, for protection from anyone, including from Genis. He had the gun in his possession when arrested on September 16.

The version of events defendant told to Detective Lilomaiava in the September 17 interview was false. He did not trust the detective and was afraid of repercussions from Genis. He confessed because he believed he would not be prosecuted based on Detective Lilomaiava's assurances. After Genis was killed, defendant tried to tell Detective Lilomaiava what had really happened, but the detective was not interested in speaking to him at that point.

Some months after the shooting, defendant parked his Camaro on a street near his home. The following morning he discovered that his Camaro had been burned. He did

not report the arson of his car to the police. The text message on his phone regarding firearms was intended for Genis, who had borrowed defendant's phone.

## DISCUSSION

Defendant makes two challenges to the admissibility of his September 17 confession—that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights, and his statement was the involuntary product of multiple false promises of leniency made by Detective Lilomaiava. Examination of defendant's opening brief reflects no argument on the issue of the validity of the *Miranda* waiver, an issue without merit which does not require discussion. We accordingly address only defendant's contention that his September 17 confession was involuntary, which we conclude is meritorious.

### *Defendant's Objection to Admission of the Confession and Ruling of the Court*

In the trial court, defendant challenged the voluntariness of his confession on the basis that it was the product of improper inducements of leniency by Detective Lilomaiava. In denying defendant's motion to exclude the confession as involuntary, the trial court found, "there's been no offers of any threats, punishment, leniency, any free pass, or any other representation that would suggest that by talking to the police, somehow this case is – the D.A. is not going to file the case, it's not going to be prosecuted, nothing is going to happen to him."

### *Applicable Law*

As explained in *People v. Tully* (2012) 54 Cal.4th 952, 993 (*Tully*), a confession is involuntary and inadmissible if it was elicited by any express or implied promise of benefit or leniency. Not every inducement to speak renders a confession involuntary; if

14

the benefit pointed out by the police flows naturally from the truth and honesty, a subsequent confession is not involuntary. (*Ibid.*; *People v. Howard* (1988) 44 Cal.3d 375, 398.) "A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. (*People v. Williams* (1997) 16 Cal.4th 635, 661.)" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) The burden is on the prosecution to establish the voluntariness of a confession by a preponderance of the evidence. (*Tully*, *supra*, at p. 993; *People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) The focus of the inquiry is on whether defendant's choice to confess was not essentially free because his will was overborne, which is determined by examination of the totality of the circumstances. (*Tully*, *supra,* at p. 993; *Carrington*, *supra*, at p. 169.)

We review the trial court's factual findings for substantial evidence, but conduct a de novo review of the trial court's finding that the confession is voluntary. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 287, 303 (*Fulminante*); *Tully*, *supra*, 54 Cal.4th at p. 993; *Carrington*, *supra*, 47 Cal.4th at p. 169.) Whether conduct constituted a promise of leniency and whether it operated as an inducement is subject to independent review. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

An interrogator's statement that he has no authority to make promises does not, standing alone, undermine a defendant's contention that his confession was involuntary. "The viewpoint is too narrow, for promises can be implicit as well as explicit, and an assertion that no promises are being made may be contradicted by subsequent conversation. (*People v. Hill* (1967) 66 Cal.2d 536, 549-550.)" (*People v. Andersen* (1980) 101 Cal.App.3d 563, 579.) "'[I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession . . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' (*People v. Andersen*[*, supra,* at p.] 576.)" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

15

*Analysis*

We have listened to the recorded portions of defendant's interrogation in fulfilling our obligation to make an independent determination of the voluntariness of defendant's confession. Defendant makes no argument that the first portion of the recorded interrogation – relating to defendant's September 16 arrest for possession of a firearm and the subsequent search of his home leading to discovery of another handgun and marijuana – was involuntary. Our review reveals no coercion in that portion of the interview.

We reach a different conclusion regarding the portion of the recording containing defendant's confession to the Becker shooting. In our discussion, we italicize those portions of the interview which contain express or implied promises of leniency and which lead to the conclusion that the totality of the circumstance show that the confession was motivated by those promises.

Detective Lilomaiava told defendant he believed defendant committed the shooting and that defendant had been identified by Becker. He said he wanted to see what defendant had to say about the shooting before presenting the case to the district attorney. Defendant said he did not recall the shooting. Detective Lilomaiava confronted defendant with evidence of his involvement in the Becker shooting, some true, some inaccurate, including that defendant had been identified by a couple of people. Detective Lilomaiava said he would write it up and put it through to the district attorney, but it is hard since people identified defendant, *and there is a big difference between being on probation and 15 or 20 years in prison*. He urged defendant to talk because he did not want defendant sitting in prison five or ten years later thinking he should have spoken to the detective.

After stating the guns were being tested for DNA and he was trying to put the case together before it came back and will "bite you in the ass," Detective Lilomaiava said he wanted to ask, "why this shit happened?" Defendant said it was for protection. He

16

denied driving or owning a Camaro. Detective Lilomaiava emphasized for a second time that *there is a difference between probation and a long prison sentence*. He suggested perhaps a shooting in front of defendant's home was the motivation for the Becker shooting, but defendant denied knowledge of that other shooting. Detective Lilomaiava mentioned probation for a third time, *stating there is a difference between probation and 15 to 20 years in state prison*. Defendant asked what the detective meant by probation. Without answering defendant's question, Detective Lilomaiava said that decision is made by the district attorney.

It is a close question whether the reference to the difference between probation and a lengthy term in state prison, made three times by Detective Lilomaiava, constitutes an implied promise of leniency. While an exhortation to tell the truth is constitutionally permissible, it is far less certain that it is permissible to suggest that a suspect will get probation rather than up to 20 years in state prison by explaining what motivated a potentially deadly shooting. We need not resolve this issue, because the subsequent interview contains statements constituting express promises of leniency as an inducement.

When the detective suggested defendant carried a gun for protection, defendant agreed. The detective offered that he would say defendant had the gun and was honest about it because his friend was killed a few weeks earlier and there were many shootings between the Blacks and Hispanics. He needed to know the motive so he could "*sell this*" to the district attorney. At this point defendant asked for the tape recorder to be turned off.

What followed was the unrecorded 12 minute interview of defendant. According to Detective Lilomaiava's testimony, defendant confessed while the tape recorder was out of the interview room. A worker brought the recorder back into the interview room, and the balance of the interview was recorded, including defendant's confession, which is in issue in this appeal.

The final portion of the tape recorded interview is replete with express and implied promises of leniency. Detective Lilomaiava began by saying he is trying to figure out

17

what happened and "*basically make it go away*," which is why Detective Lilomaiava needed defendant's help. Detective Lilomaiava further stated, "*I can make it go away with you talking to me and telling me what happened. You know what I mean?*" Defendant said he did not want "that coming back to me" and asked if he could "have that in writing." Detective Lilomaiava assured defendant it would be in a report, but defendant said he wanted to see paperwork so "that thing won't come back." Detective Lilomaiava said he would record it and write a report, but defendant said he "got screwed already, man." After a few additional comments, Detective Lilomaiava stated, "Listen, I, I got to go. I have to be somewhere. All I'm trying to do is trying to figure out and make it, *I can make it go away but . . . .*" Defendant asked "*but this thing is going to go away, right?*" Detective Lilomaiava answered, "*Yeah.*"

This colloquy, alone, is sufficient to demonstrate that the interrogation leading to defendant's final confession was tainted by improper promises that the shooting case would go away if defendant simply explained its motivation. Defendant's motivation to confess is demonstrated by him seeking assurances that the case would go away, followed by an express promise that it would by Detective Lilomaiava.

As the interview progressed, additional express promises of leniency were made to defendant. Defendant would not disclose who was with him at the time of the shooting, nor did he describe the shooting in detail; instead, he simply told the detective that one thing led to another. Detective Lilomaiava said he would not write that down, "the dude [Becker] is not even going to, doesn't even want to do anything with it," and *the only reason he was talking with defendant was his desire* "*to clear my case.*" Defendant said he did not want to get charged for that case, but Detective Lilomaiava said "that's the case you have to worry about." Referring to the shooting of Becker, Detective Lilomaiava said it would "*bite you in the ass if you don't talk to me. But that's the one that I'm trying to help you out with.*" Thus, defendant was lead to believe the only purpose of the interrogation was to clear the case with his explanation, and if he did not talk, it would "bite [him] in the ass."

Adding to the expressions of leniency in return for a statement, Detective Lilomaiava said, "*This one, I can honestly tell you that you* [*sic*] *talking . . . probably go away.*" When defendant sought clarification if the decision was up to the district attorney, Detective Lilomaiava said, "*It might not even go to the DA. I might have to just write out a report and file it away.*" When defendant asked if he could have Detective Lilomaiava's word on that, he said it is on the recording. Defendant replied "you guys are freaking tricky." Detective Lilomaiava assured defendant "*you don't have to worry about this case*, is [*sic*] that the case right there you have to worry about." Defendant said, "But that's a bigger case, isn't it?" Detective Lilomaiava replied, "*Bigger case but sometimes bigger case ain't going anywhere. And that's why I, told you just better off you saying something.*" Defendant said, "*That's, this is going away, right?*" Detective Lilomaiava said, "*Yeah.*"

Our independent review of the totality of the circumstances leading up to defendant's ultimate confession accordingly demonstrates repeated promises that the case was go away if defendant explained the motivation for the shooting. He was told that the case was not going anywhere, it might not even go to the district attorney, and ultimately was given an express promise that the shooting case was going away. His full confession then followed.

Any doubt that the assurances of leniency motivated defendant's confession is eliminated in this latter part of the interrogation. Although he had unambiguously told defendant several times the shooting case would go away, Detective Lilomaiava later told defendant that this is the case defendant had to worry about and he would talk to the district attorney about it. Defendant objected that Detective Lilomaiava told him he did not have to worry about this case. Detective Lilomaiava equivocated and said there is more chance of this case not even going anywhere and being dropped. Defendant said he did not want to be charged with the shooting case. Returning to what he earlier told defendant, Detective Lilomaiava said that based on what he knows the case is "*not going to go anywhere,*" the only reason he was talking to defendant about it was so that "he can know what happened" and "*basically this, this case is gonna* [*sic*] *away.*"

19

Detective Lilomaiava again softened his stance regarding the case going away, by saying he would write it up and have his boss review it. Defendant said, "all right but going to go away, right?" Detective Lilomaiava said he would talk to his boss and "*this is probably not going to go anywhere.*" Detective Lilomaiava said the shooting victim "doesn't give a shit about what happened" and "he . . . doesn't want anything to do with it. [¶] So, you actually lucked out." Detective Lilomaiava reassured defendant "*this probably not going to go anywhere,*" and defendant should not worry about this case.

This discussion further solidifies our conclusion that defendant was repeatedly told the case would go away if he explained what happened, that defendant relied on those repeated promises, and that his confession was the direct result of impermissible promises of leniency.

The Attorney General accurately notes that at times Detective Lilomaiava told defendant he did not make the final decision on a case, that it would have to go the district attorney, and that it would be reviewed by the detective's boss. While we agree those statements are interspersed throughout the interview, they are overshadowed by the more emphatic and compelling promises of leniency. The Attorney General's argument that "there was no promise of more lenient treatment at the hands of the police, prosecution, or court" is belied by the repeated statements made by the detective indicating that he merely wanted to know the motivation for the shooting and the case was going to go away.

We also reject the Attorney General's argument that it is not entirely clear that Detective Lilomaiava was referring to the shooting case in making his various statements about the case going away. Listening to the recording of the interview, as opposed to merely reading the supporting transcription, leaves no room for doubt that the detective was referring to the shooting case going away. The express statements that the case would go away were made in that portion of the interview pertaining to the shooting. We have no doubt Detective Lilomaiava's references to a case going away pertained to the shooting of Becker.

20

The remaining issue is whether admission of defendant's confession, contained in the final portion of the tape recording, is prejudicial error.

### *Prejudice*

Admission of an involuntary confession is not reversible error per se. "The prejudicial effect of such error is to be determined, for purposes of California law, under the generally applicable reasonable-probability test embodied in article VI, section 13, of the California Constitution. (*People v. Watson* [(1956)] 46 Cal.2d 818, 836 [(*Watson*)].) Of course, because the *Watson* standard is less demanding than the harmless-beyond-a-reasonable-doubt standard mandated by the applicable federal constitutional authorities (see [] *Fulminante*, *supra*, 499 U.S. [at pp.] 306-313; *Chapman v. California* [(1967)] 386 U.S. 18, 23 [(*Chapman*)]), whenever a confession admitted in a California trial has been obtained by means that render the confession inadmissible under the federal Constitution, the prejudicial effect of the confession must be determined under the federal standard." (*People v. Cahill* (1993) 5 Cal.4th 478, 509-510.)

Introduction of defendant's confession did not result in any prejudice to defendant as to the misdemeanor firearm possession charge in count 4, which was based on his September 16 arrest. The evidence as to count 4 is undisputed, and defendant's confession to possession of the firearm was not tainted by the promises of leniency that came later in his interrogation. The same cannot be said, about the attempted murder conviction in count 1, the assault with a firearm charge in count 2, and the possession of unregistered handgun charge in count 3.

Here, we deal with a tape recorded confession, which may tempt the jury to rely on that evidence alone to convict. (*Fulminante*, *supra*, 499 U.S. at pp. 297-298.) As explained by Justice Kennedy, "If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal

21

defendant's plea of innocence." (*Fulminante*, *supra*, at p. 313 (conc. opn. of Kennedy, J.).) "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.' [Citations.]" (*Fulminante*, *supra*, at p. 296.)

Factors identified in *Fulminante* point toward prejudice in this case. Although there is substantial evidence of defendant's guilt without regard to his confession, it is far from clear that the case would have been filed without it, and there is certainly no reasonable doubt that the confession affected the verdict. No witness identified defendant as the shooter. The victim, Becker, may fairly be described as a less than reliable witness. Although defendant possessed two firearms, neither was tied to the Becker shooting. The jury had some difficulty with the case as reflected in its findings that the gang, great bodily injury, and hate crime allegations were not true. The confession certainly was the most powerful evidence connecting defendant to the shooting of Becker. (See *Fulminante*, *supra*, 499 U.S. at pp. 295-296.) Admission of the confession also tended to corroborated other evidence pointing toward guilt. (*Fulminante, supra,* at p. 300.) These circumstances point unerringly toward prejudice under the *Chapman* standard of review.

## DISPOSITION

The judgment is affirmed as to count 3, but reversed as to counts 1, 2 and 4. The cause is remanded to the trial court for further proceedings on counts 1, 2 and 4.


KRIEGLER, J.


22

We concur:

MOSK, Acting P. J.

KIRSCHNER, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.